Larry Kazanjian. I represent Petitioner Capay in this matter. This matter is before the Court on our request, Petitioner's request, that this Court direct the National Labor Relations Board to conduct an evidentiary hearing into a number of objections that were raised at the time of an election, a representational election, held under the rules of the National Labor Relations Act. It is interesting to note, as I look through the context of this entire case, that Petitioner submitted detailed, detailed affidavits as to the conduct that was alleged to be violation, a violation of the Act and a violation of these, the laboratory conditions that are required before an election can be conducted, and which makes an election fair. Petitioner submitted detailed affidavits, and it's important to understand this because these detailed affidavits contain certain types of conduct that in and of themselves could violate the Act. The affidavits were not refuted in any way before the Board made its decision. That is to say that the regional director had absolutely no evidence whatsoever to refute any of the allegations made by the various affidavits. The affidavits were submitted by individuals who were affected by the conduct, that is, they were the bargaining unit employees, who were subjected to the type of conduct that is being alleged, that Petitioner alleges violates the Act. The problem here is the question of how much evidence can be presented at, at or about the time we submit objections to the conduct. Obviously, this Court has addressed this on multiple occasions. The first time it addressed it was in Belfoundry. And in Belfoundry, this Court said that any inferences to be drawn from the evidence presented by the objecting party should be in favor of the objecting party. Well, if you look at the Board's decision, regional director's decisions, there were no such inferences drawn. Every inference he drew was based upon a supposition that there was no violation of the Act. Sotomayor, could you please get down to brass tacks in the sense of saying what are the specific instances of misconduct that you claim occurred? Yes, sir. The affidavits show, and the evidence that was presented is that, one, there were multiple telephone conferences conducted at least 24 hours. So we're talking about the peerless plywood standard, electioneering 24 hours before the election. There were multiple telephone calls done by the, the business agent, multiple telephone calls at night under circumstances that suggested coercion and, in fact, resulted in coercion if you listened and you believed the affidavits, which are unrefuted, that resulted in coercion. There were multiple attempts to contact employees within that 24-hour period. There were attempts to gather employees outside of the building on the day of the election. There were attempts to gather employees, put them into a group, and as you know, these compelled group meetings within 24 hours prior to an election are unlawful. The question is, were they coercive? Were people actually coerced into doing that? Well, that's a question of fact that needs to be ferreted out during a hearing and not by a conclusion that, I don't think that could have happened. Most importantly, and perhaps the one thing that might sway all of us, is this idea that there were discussions with regard to the immigration status of these employees. Let me ask the Court this. If, in fact, the tables were turned and the employer was accused of making a statement to employees with regard to their immigration status if they voted for the union, would you have any doubt whatsoever that such statements would constitute coercion and that any election results would have been overturned in a minute and, frankly, you would have had a Gissel bargaining order that would have resulted in a Gissel bargaining order saying you can't even have a fair election under those circumstances? Well, here we have allegations that the union was making comments and suggestions that the employee would employer would retaliate against employees if, in fact, they voted for the union. All right. So it seems to be a bit convoluted, and Respondent, in fact, did raise some issues about why it's convoluted. Well, the reason it's convoluted is because we had about five days to collect the information and put it into an affidavit so that we could get a hearing. This is not a situation where we presented to the Court absolutely no evidence whatsoever. We presented quite a bit of evidence, actually, in comparison to some of the other cases that have come before this Court. This Court alone has said in numerous cases that we don't have to prove our case, and I'm – I don't think this Court nor any other court has actually developed what the standards are. I do want to address one factor about what the standards are, however, and that is that the Respondent has suggested that we have a heavy burden, and that's the language used in the brief. We have a heavy burden to establish enough evidence to have a hearing. That's simply not the case, Your Honors. And I ask you to look at the cases that the Respondent decided. I believe it's the Veritronics case and the Metro Truck Body case. In both of those cases, in fact, in the Veritronics case, there was no mention of heavy burden. In the Metro Truck Body case, they mentioned heavy burden, but only in the context of setting aside an election. So the question becomes, what's the standard that we have to apply to get a hearing? Because that's all we're asking for. We are not – and I want to make that clear, if it's not been clear, that we're not asking this Court to set aside the election. We're asking for a hearing. And those standards, if you look at this Court's history, and that would be the Bell Foundry case and the Valley Bakery case, those standards are a little bit looser. It's not a scintilla. It's not clear and convincing. It's not a preponderance. But there's got to be a standard somewhere in there that's short of, quote, a heavy burden, because if we had a heavy burden just to get a hearing, what's the burden to turn over the – to turn over the election? It's almost impossible. Is it beyond a reasonable doubt? I don't know. But it doesn't make logical sense for us to suggest that we have a heavy burden. In fact, that's not what the case law says. There is one case in particular that was cited in the Metro Truck Body case, decided in 1979 by this Court. And these, again, are all Ninth Circuit decisions. Valley Rock, 590 FedSecond 300, 1979. That's where the language of heavy burden was first suggested. And it was in the context of overturning an election by the board after a hearing. And, in fact, in that case, one affidavit sufficed from an employee to allow the petitioner at that point, the employer, to go forward with a hearing. And so the hearing was directed in the Valley Rock case. So in substance, all of these issues need to be discussed and need to be brought out in terms of evidence. We haven't had, for example, an opportunity to cross-examine the union representatives who were present and who were making the threats, who were attempting to coerce employees. We haven't had that opportunity. Don't we get an opportunity to at least suggest to a trier of fact that this conduct in the manner it was conducted on this occasion, in fact, coerced not only these seven employees, but a number of other employees who, in fact, either voted for or against the union? I see a question, if you might. Just go back to the issue about immigration threats. Yes. The immigration threats were that if the union were not elected, then the I-9s would be checked and people would be terminated? Correct. So, ostensibly, it's a retaliatory act. You voted for the union, you lost. We're going to check your I-9s and we're going to fire you. Is it your position that that would occur independent of how the individual worker had voted? Well, I think what would have happened, Your Honor, under those circumstances, and again, we're speculating, and one of the things, and that's what in my mind requires a hearing, but one of the things to consider is the employer would have the opportunity, if you believe the union, to decide who voted and who didn't. And internally, you know that that happens, that I know that this employee voted for the union. The union's out. I'm getting rid of this employee because I don't want him anymore. So, the threat is retaliatory. And if you look at the Valley Bakery case, frankly, that's exactly what happened. The union was suggesting during the election period that the employer would retaliate against them and fire them if they didn't vote for the union. Even though the ballots are secret? Even though the ballots are secret. I think it's naive to believe that in a small working community, one doesn't know who voted and who didn't vote for the union. I think that's a naivety. We arguably shouldn't, but I think in the practicalities of the business world, everybody knows who's voting for whom. So it really, it boils down, it comes back to the same issue, and that is, why do we not get a hearing over these very specific allegations that were alleged? I will tell you that, and you see it in our reply brief, that we went through all of the cases that respondents cited where some of the conduct alleged didn't result in an overturning of the election. The irony of all of those cases, the irony is that each one of those cases was as a result of a hearing. They weren't as a result of a decision not to have a hearing, and as a result of the regional director deciding I'm not going to grant a hearing. Every single one of them, and I think we cited 10 or 15 of them, every one which dealt with some of the very same issues that we're dealing with that we raised, the petitioners raising as the basis for overturning the election. Every one of those cases were the result of a hearing, and not the result of the regional director's decision to forego a hearing. How difficult would that be? The hearing is a day or two or three or four, and by that time, we would have the opportunity to subpoena witness, cross-examine. And frankly, the witnesses who served affidavits on petitioner's behalf would also be subject to cross-examination as to whether they, in fact, were coerced or harassed as a result of the union's conduct. So again, if we were asking this tribunal to reverse the election, overturn the election, set it aside, I think we'd have a completely different argument here, I think our burden would be much different than what it is now. We're not asking for that, we're simply asking for one thing, have a hearing. Let us have a hearing. And by the way, I think the regional director's conduct can be measured also in the manner in which it handled the one objection, unrelated to the conduct of the election, but related solely to what happened in the hearing to determine whether the election would go forward. And that is this decision about the sanitation workers. It is ludicrous to assume that the board would have left these sanitation workers in a state of limbo, which it is, that they're either excluded, they're neither excluded nor included, with the stipulation that we would decide after the election if necessary. That was two votes, right? It was two or four votes, Your Honor. But what it does in our mind is show that the regional director's decision-making was kind of misguided. It was preferential. It tended to lean towards the union's, all of the union's argument, and left us without any remedies. What do we do with those two votes? Well, no, I don't think so. The vote was 23 to 15. There were four sanitation workers. If you take them out of the equation and assume they don't have the right to vote and assume that they all voted in favor of the union, it's still 19 to 15. So the board says, this doesn't matter. And in terms of whether they're appropriately part of the union or bargaining unit, we can determine that later on. But in terms of how that might have affected the vote is totally irrelevant. I agree. I understand what you're saying, Your Honor. However, the problem is that because the board said they're neither excluded nor included, they sit in a state of limbo. Are they in the bargaining unit or are they not currently? Yeah, but what does that do to your argument? I don't understand how that helps you one way or the other. It's only looking at the board's conduct as a whole. So looking at the board's conduct as a whole and denying us a hearing on what we all agreed upon in a stipulation, that stipulation was once the election was over, we would deal with those four, not in a separate proceeding. It doesn't say that in the stipulation. We have four employees who have no status. If, for example — But I don't understand why that tells me that you should have had a hearing. It's all — again, it's only one part of the whole. We should have had a hearing on all five of the objections. It's one part of the whole. The reality is, assuming for the moment that — Your objection is to the outcome of the election. Your objection is not as to who's within the protected class of union. I agree with that. That's true. I agree with that. Okay. Let me leave you with this thought and leave myself with some time for rebuttal. One thing I can say is that we have to look, the Court should look, and your case law has suggested this, we look at the totality of the circumstances, the cumulative effect of the conduct. And that's in the cases that have been cited by our office in the Petitioner's Brief. We've talked about the cumulative effect of the conduct. You can't isolate each one of these affidavits individually and say, well, individually, if I look at one affidavit with one allegation, I can throw it out. Okay. Let's show them the other side, and you've saved some time. Thank you, Your Honor. And I gather you're splitting time. May it please the Court? My name is Rebecca Johnson, and I'm here on behalf of the National Labor Relations Board. To start, I'd just like to clarify the standard for obtaining a hearing on post-election objections. I believe in our brief, we say that the respondent would bear a heavy burden in overturning an election. In order to get a hearing, they simply have to present specific evidence which, if credited, would warrant setting aside an election. They simply have not done so in this case. In their reply brief, they also claim that the Board somehow usurped, or somehow did not live up to their duty to investigate. That's not the Board's role here. The Board is simply supposed to look at the objections and the offer of proof on their face to determine whether they have met this threshold showing in order to have a hearing. And they simply have not done so in this case. What about the objections about contacting employees within the protected window? This is Objections 2 through 4. The Board looked at those objections as alleging a peerless plywood violation. The Board's peerless plywood rule is very narrow. It simply prohibits one of the parties to an election from conducting speeches to mass assembly at any time. If you look at each of the affidavits and the objections, the company simply has not alleged a peerless plywood violation. These types of contact with the employees were not on company time. They weren't in mass assembly. At most, they were in small groups, if you take the evidence to be true. And it simply does not fit into the Board's narrow peerless plywood rule. And the Board also, on the request for review, found that the company had alleged additional electioneering and surveillance claims. The Board found that these claims were waived because they were not presented first to the Board. But even if you were to look at them, they also do not fit into the Board's prescriptions on electioneering and surveillance. Turning to the so-called threats, the Board has broad discretion in this area for supervising representation elections. And they've sort of carved, while they aspire to laboratory conditions for their elections, they've sort of carved out different areas to determine whether a conduct is coercive. And in the context of threats of job loss or immigration status like this, they have found that the coercive nature of this type of comment derives from a party's ability to carry out that threat. And here, these threats can be considered illogical. So a reasonable employee hearing this would know that the union could not carry out this threat. That the union could not fire employees and could not check their I-9s. And this court in Valley Bakery has sort of acknowledged this principle that these types of threats are illogical where the union is targeting employees en masse rather than union supporters. Valley Bakery is distinguishable because there, the allegation was that the union was claiming that the company would fire employees who had signed authorization cards, thereby presenting some type of support for the union. In that case, the threat wouldn't be illogical and a reasonable employee could tend to be coerced by that type of threat. The company produced affidavits from two employees on this issue that you're just talking about, correct? That's right. Why not hold a hearing? If you have two employees that say, I believe I was threatened in this way, why not find out if that's not pervasive? First of all, the standard is objective. So whether or not these employees felt coerced or harassed is not the standard. The standard is whether a reasonable employee would. And the regional director simply looked at the board's case law for these types of comments and found there wasn't a prima facie case. The nature of threat is in the eye of the beholder and the receiver. If you're sitting on your front porch and your neighbor across the street walks by and says, you have a beautiful house here, I hope nothing happens to it. That's one thing. If Tony Soprano walks by your house and says, you have a nice house here, it'd be a shame if something happened to it, that could be a threat. Why not find out through a hearing? The board has devised this sort of threshold showing in order to ensure that only something with substance gets passed to a hearing stage. I could understand, one could understand, if the threat was if you vote for the union, people from Mars will come down and kill everyone with brown skin. That's perfectly illogical, but a threat of the nature that relates to immigration status, why not find out if it was pervasive? This is simply the sort of contours that the board has defined for these types of comments during a representation election. It doesn't neatly fit into the types of threats that the board typically finds coercive. Is that because you're saying that the employer, in fact, would not have had access to the information? Or are you saying something else? They couldn't determine who voted yes and no, but that's not what the company is alleging. No, no, access to the immigration information. Because I'm accepting as, in fact, fairly likely in the real world of the workplace that the company probably does have a fairly good idea of who was pro-union and who was not. Can you repeat your question, please? I don't understand. I'm trying to figure out if one of the arguments you're making is that the union wouldn't have access to the information as to the immigration status of the workers, and therefore say that the union's going to do this. Well, it can't be true because they don't have access to the information. Is that the argument? That's right, and also the company is not alleging that the union claimed it was going to check their immigration status. The company is alleging that the union claimed the company would be checking immigration status and I-9s. Right, no, I understand that. But the union was not claiming that it would check those. No, no, I understand. The union was saying, listen, if you vote for the union, the union's going to go and find out which one of you guys are here illegally, and they're going to kick you out of the country. No, no. The company is claiming that the union says the company would be checking immigration status. Yes, I understand. That's what I was trying to say. And if you vote for the union, we'll protect you from that. That's right, and that's why the board also- Or if you vote for the union and the union succeeds, we'll protect you. If it fails, sorry, we can't help you because there will be no union. That's right, and that's why the board also analyzed this under Midland. As campaign propaganda, which the board has a very lenient rule for. It does not probe into the truth or falsity of campaign propaganda. It simply looks to see whether there's a forgery, and if there's a forgery, then the employees perhaps could not recognize that campaign propaganda as propaganda. But overall, the board looks to employees as mature individuals who can discern these by the union or whether they actually have the ability to carry out these types of threats. Finally, turning to the employer's totality of the circumstances argument. The board is not required to conduct a totality of the circumstances argument. And this court has said that these types of arguments should be approached with caution. You can't use this type of argument to turn a number of insubstantial objections into a true challenge, which the company is trying to do here. The regional director appropriately looked at each of the objections, found them each to fail under the standard for getting a hearing, and properly found that no hearing was warranted in this case. I'd like to briefly turn to the first objection. The board's position is that Capay is not aggrieved by this portion of the board's order, and that this court does not have jurisdiction to hear this particular objection. Capay has been ordered, the order that this court is reviewing, orders Capay to bargain with the union as the representative of a certain classification of employees. These four employees are neither included in nor excluded from the unit, so they are not required to bargain with these four employees. In any event, the board acted within its normal procedures in voting these four employees subject to challenge, and then once their votes were not determinative, in putting language into the certification that they were neither included in nor excluded from the union, it was incumbent upon counsel to sort of know the board procedures under which he was practicing. The board didn't deviate from its usual standards, and so a post-election hearing on this issue is not warranted. If there are no further questions, we ask that the court enforce the board's order. Okay. Why don't we hear from the union? Good morning, Your Honors. Caroline Cohen on behalf of Bakery, Confectionery, Tobacco, Workers, and Grain Millers, Union Local 85. I'd like to first note, by pointing to the court's attention, the first objection that was filed by Capay as to the sanitation workers' inclusion in the unit is indicative of the validity and merit of the rest of the objections, as it is a frivolous objection, and the appropriate course would have been for the employer to have filed a UC petition for clarification of the unit. That gives me, I think, a good opportunity to compare the two. Certainly, objection number one is one where it is relatively easy to look at the decision of the regional director not to hold a hearing because these sanitation workers, even if they're not properly voting, it wouldn't have affected the outcome, and you can later determine, through the procedure you described, whether they are part of the bargaining unit or not. But let's jump down to the two affidavits from employees who said, for lack of a better description, they felt they were threatened on this immigration issue. Why isn't that the kind of issue that there should be a hearing to find out if it's true and if it's pervasive? I would first direct Your Honor's attention to the fact that one of those affidavits was not signed, and the threats that are putting that aside. We have one signed affidavit from an employee who voted in the election and said that he felt threatened by some statements that were made to him. Why not find out if that was pervasive? Well, first, reiterating what counsel for NLRB stated, the standard is not whether an employee subjectively feels intimidated or coerced. The standard is whether there's an objective understanding that the behavior is coercive. And here I would direct Your Honor's attention to the line of authorities which look at whether threats of job loss are coercive enough to taint free expression in voting in an election. If you look at NLRB versus Downtown Bid Services, Pacific Grain Products, the court found that it's illogical for an employee to believe that an employer would carry out or I'm sorry, that the union's prediction that there might be job loss or hear that there might be a potential that the employer would check immigration papers was illogical. There is no way for the union to know for certain that the employer would, in fact, check immigration papers. If the shoe were on the other foot, would that require a hearing? I'm not sure if I understand the question. If the company in the course of a representation election told a potential union member, if you vote for this union, we're going to go check everyone's immigration status and get rid of anybody who's not 100 percent clean sheets. The standards should be applied equally as between unions and employers as the objective and aim of the act is to ensure free expression in an election. So the answer to your question is no, it would not make a difference in the analysis. The question is whether there's, well, actually, the relevant inquiry, I'm sorry, let me correct myself, is whether there's an ability for the actor who makes the expression to carry out that threat. We see this in, I'm sorry, the Smithfield packing case. If the entity does not have that ability to carry out the threat, then it's not, it does not give rise to objectionable conduct. But that doesn't really respond to the reality of the reaction. That is to say, if I am a worker in that union and I'm worried about my immigration status, even, I think I might be legal but I think I've got a problem, or I know I'm here illegally, am I going to be really confident that this company is without power to bring the immigration authorities down on my head? I'm going to be terrified. I mean, the employer calls up the INS folks and says, hey, I think I've got some illegals here, why don't you come over and check? I think the union, I think the company has the power to do that. I understand your point, Your Honor. However, I think the authority that CAPE cites is distinguishable from the alleged threat that occurred here. In one of the cases, the RAA services case, there was a direct threat by an employee who was known to support the union that the employees might be deported if the union won. Here, there was a statement that was more equivocal that the employer could check I-9 papers, and if the union was in place, the union could protect them. And the union is not prohibited from assuring protection to its employees who it represents if it were to win the election. So I think the authority is distinguishable. Okay. Any further questions from the bench? No, thank you. Okay, thank you. Thank you. And you've saved some time. Thank you. Just two comments. One is the Valley Rock case that I previously cited that was part of the progeny leading up to Valley Bakery. So this is a case that was decided in 1979. It was also within the cases cited by a respondent. In that case, one employee, I believe his name was Towle or T-O-W-L-E, that employee believed that he was being coerced and threatened. And what the court said, this court, the Ninth Circuit said, is that you can't infer as a matter of law that he wasn't coerced or threatened. And that is a standard that this court has used. You can't infer as a matter of law that this individual who provided the affidavit saying that he was concerned about his immigration status based upon the union's comments, you can't infer as a matter of law that he wasn't coerced. Therefore, as in the Valley Rock case, a hearing was granted. Mind you, I would suggest that if we look at the cases that counsel for the union has cited, all of those cases were decided at the hearing stage and not at the pre-hearing stage where the original director made a decision not to conduct a hearing. Ms. Cohen points out that one of the affidavits on this immigration issue was unsigned. Is that correct? Go back and look at the record, Your Honor. It may very well have been correct, but it was handwritten in the individual's own. It wasn't like it was a typed affidavit that was not supported by somebody. It's unsigned. I believe that may be the case, Your Honor. I'd have to go back and look at the record to make sure. Again, recognizing, as Valley Bakery recognized, we have very little time to gather the type of information that we want. And, frankly, if we get too in-depth in the inquiries as to whether the conduct was coercive and the nature of the conduct, the first thing that happens to us is we get hit with an unfair labor practice charge saying we're interfering with the election. And you're saying, well, but it was written in the handwriting of the employee. Well, but if it's unsigned, how do you know? It might have been somebody else writing it down. Very good point, Your Honor. Okay. Thank you, both sides, for your helpful arguments. CAPE versus NLRB submitted for decision. And that concludes our arguments for this morning.
judges: Hawkins, W. Fletcher, Kronstadt